Argued 18 April, decided 18 June, 1907.

**LE BRUN *v.* LE BRUN.**

90 Pac. 584.

GIFT CAUSA MORTIS—EFFECT OF EVIDENCE.

It appears that defendant, when dangerously ill, deeded the property to plaintiff, who thereupon executed back the deed in question, which was delivered to a third person, who delivered it to defendant after his recovery, in view of which it must be held that the deed was a gift *causa mortis* and was clearly revoked by the acceptance of the deed revesting the title.

From Marion: WILLIAM GALLOWAY, Judge.

Suit by Charles Le Brun against Firmin Le Brun to cancel a deed. Plaintiff appeals from a decree dismissing the suit.

AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. George Greenwood Bingham.*

For respondent there was a brief with oral arguments by *Mr. William Marion Kaiser* and *Mr. Tilmon Ford.*

Opinion by MR. CHIEF JUSTICE BEAN.

This is a suit to cancel and annul a deed from plaintiff to defendant for 319.13 acres of land near Gervais, in Marion County. The land in controversy is the donation claim of defendant, upon which he has continuously resided for more than 50 years, except for about 2 years when he lived with the family of the plaintiff. On December 14, 1900, while he was sick and expecting to die, he conveyed the land for the expressed consideration of "$1,000, love and affection, and other valuable consideration, and for my maintenance and support for and during my natural life," to the plaintiff, and at the same time the plaintiff and his wife executed a deed, reconveying the property to the defendant, which deed was left in the custody of Father Schell, a Catholic priest. The defendant subsequently recovered from his then illness, and obtained from Schell the deed executed by the plaintiff in his favor and filed it for record, whereupon this suit was commenced to cancel and annul such deed, on the ground that it was wrongfully delivered.

The plaintiff's contention is that the deed to him from defendant was intended as an absolute conveyance in payment of an indebtedness of about $1,000, and the further agreement on his part to support and maintain defendant during the remainder of his natural life, and that the deed from him to the defendant was mere security for the performance of the contract for support and maintenance, and was to be held by Schell for that purpose, and that he has fully performed such contract, notwithstanding which Schell wrongfully delivered the deed to the defendant, who caused it to be placed of record. The defendant, on the other hand, claims that the deeds referred to were parts of the same transaction, and were intended as a testamentary disposition of his property; that at the time they were made he was dangerously ill and did not expect to live but a short time, and, in order to dispose of his property after death, he made a conveyance to the plaintiff, but took a reconveyance from him, which was to be deposited with Schell to be delivered to defendant in case he recovered from his then illness.

The plaintiff is a nephew of defendant, and came to Oregon from Canada at defendant's request more than 25 years ago. For the first two years after his arrival he worked for defendant to pay his "passage money," and a few years later married a niece of defendant's wife. For 10 or 12 years after their marriage the plaintiff and his wife lived with the defendant, farming the land in controversy on shares. They then moved to a place of their own, two or three miles from that of defendant, where they have ever since resided; the plaintiff continuing to cultivate and farm the defendant's land on the shares as before. In December, 1900, the defendant, who was then about 76 years of age, and in poor health, requested Scott Taylor, a notary public, to prepare a will for him, devising his property to the plaintiff, as his wife had died some years previous and he had no children or near relatives. Before the will had been prepared and executed, however, the defendant went to Portland to consult a physician, but, obtaining no relief, returned to Gervais, where he was met by the plaintiff and taken to his (plain-

49 OR.—— 24

tiff's) home. On the afternoon of the 14th he was taken suddenly and dangerously ill, and Father Schell, a neighboring Catholic priest, was immediately summoned. He had previously consulted Schell about the disposition of his property, and had advised him of his intention in that regard, and, as soon as Schell learned of his serious illness, he telephoned to Taylor to bring the will which he had prepared and some blank deeds. Schell and Taylor arrived at the plaintiff's house in the evening, and found defendant very sick and apparently near final dissolution.

The matter of the disposition of his property was immediately mentioned by some one of the parties, and Schell testifies:

"He (defendant) told me that in case of his death, which he expected soon, he would like to give all that he had to the plaintiff and his family, and to use my best judgment and do whatever I thought best, as he had full confidence in me. He wanted me to will the land to the plaintiff. I suggested a deed in place of a will. The plaintiff had absolutely nothing to do with it, and was not in the room, and knew nothing about it until I went into the kitchen and informed him in what way I had transferred the property to him. The deed was adopted in place of a will to save court expenses and to remove all chances of a possible contest of a will. It was my idea to put in a $1,000 cash consideration. It was wholly fictitious, and done to give the deed a better appearance. Chas. Le Brun was to give a deed back in case the defendant should not die. This latter deed was to be kept by me, and in case the defendant should get well, I was to deliver it to him to be kept or to be put on record, according to his wishes. It was left with me because he was sick and unable to take care of it, and I was to deliver it to him if he recovered from his then sickness, as it was his property. No one was present at the time the deeds were made, except Taylor, the defendant and myself. There was no agreement between the plaintiff and defendant about the deed. The understanding was that, if the defendant did not survive his then sickness, I was to destroy the deed, but, if he did, I was to give it to him. The transfer by defendant to the plaintiff was a pure gift, and the matter of support and maintenance was not mentioned at the time, nor did any previous indebtedness operate as a consideration. The defendant recovered from his illness in three or four months, and asked for the deed, and I delivered it to him."

Taylor, who prepared the deeds and was present at the time

of their execution, testifies that the defendant was very sick
when he and Schell visited him: ·

"I had told him I had made the will as directed and it was
ready for signing. He said: 'You can talk to Father Schell
about the matter. I think I will deed the land to the plaintiff.
I want him to have it anyway.' When I started in to draw the
deed, I asked for the amount of consideration, and plaintiff,
Schell and the defendant had some conversation about the mat-
ter. I did not hear what they said, except occasionally some
references to wages and hauling lumber, and that plaintiff said:
'You fix it to suit yourself. You make it to suit yourself. It is
all right.' One thousand dollars was finally agreed upon as a
consideration, and I put it into the deed, and also a stipulation
for support and maintenance. Defendant said: 'Put in main-
tenance and support. Charley has got to keep me as long as I
live. That is the understanding. I do not think I will live
very long, because I am pretty sick.' I made out two deeds to
the plaintiff at the time, one for the farm and the other for
the Woodburn property. I had no stamps with me, and the
next day the plaintiff brought the deed for the farm, and I
stamped it, and he took it to be recorded. I also prepared at
the same time two bills of sale from the defendant, one to the
plaintiff's daughter and the other to the plaintiff. Schell gave
me the description of the personal property. After the two
deeds and bills of sale had been prepared, Schell asked me to
make out a deed from the plaintiff and his wife to defendant,
and said he wanted it to hold over plaintiff for a whip if he did
not maintain and support defendant as agreed upon. When
the deed was made out, Schell called the plaintiff and his wife
into the room, and I explained to them the purpose as best I
could in French, as they did not speak good English, and said
to them that Schell was to hold the deed and see that defendant
is treated right if he lives, and, if he dies, to give it to you.
They hesitated about signing it, but finally did so. The deed
was not stamped, because Schell said it was not to be put on
record. I don't think the defendant said a word while the mat-
ter of the deed was being talked over, as he was pretty sick and
expected to die at any time. After the deed from the plaintiff
to the defendant was executed I handed it to Father Schell."

The plaintiff, so far as he was able to testify as to what oc-
curred at the time the several deeds were executed, corroborates
the testimony of Schell, but neither the defendant, the plaintiff

nor his wife can give a very intelligent account of the transaction—the defendant, because of his illness, and the plaintiff and his wife, because they were not in the room when the matter was arranged, and know but little about it, except what others told them.

John La Chapelle, one of the witnesses to the deeds, testifies that he was asked to come into the defendant's room and witness the deeds, that, according to his understanding of what was said at the time, the deed from the plaintiff to defendant was to be left with Schell, and, if defendant got well, it was to be delivered to him, and if not it was to be returned to plaintiff.

Louis Forcier, a son-in-law of the plaintiff, who was in the house at the time, but not in the room when the deeds were executed, testified that the plaintiff came into the kitchen with the deed from defendant in his hand and gave it to his wife, saying that the defendant had given him the property if he died, but, if he got well, he was to have it back, and that the deed from the plaintiff and his wife to the defendant had been left with Schell, and, if defendant died, Schell was to destroy it, and, if not, to deliver it to the defendant.

No change was made in the possession or cultivation of the property in controversy after the deeds referred to had been executed, and the plaintiff continued to farm it as before, delivering to the defendant each year his share of the proceeds. Whatever conflict there may be in the testimony, or whatever inference may be drawn from it, one important, and to our mind, controlling fact stands out prominently, and is uncontradicted. The defendant at the time the deeds in question were executed was providing for the disposition of his property after death. He was dangerously ill, and neither he nor any of the parties interested expected him to recover. His spiritual advisor and a notary public had been hastily summoned to administer to his spiritual comfort and to arrange for the disposition of his property. The method of effecting the purpose was discussed, and the plan adopted finally agreed upon as the most convenient and satisfactory and least expensive. There was no intention

on the part of the defendant to make a gift of his property to the plaintiff *inter vivos,* nor to provide for his own future support and maintenance. He though he was about to die, and naturally would not be considering a question of his own future support, and no one pretends that there was any conversation between him and the plaintiff concerning that matter, or that it was ever discussed by them. The clause in the deed to that effect was inserted by the notary principally, if not entirely, upon his own motion, and it is contrary to all the circumstances of the case and the manifest intention of the defendant to assert that the deed was made by him to plaintiff in consideration of an agreement for future support and maintenance, or that the reconveyance from the plaintiff to him was intended to secure the performance of such an agreement. The parties were not dealing with or considering matters of that kind, and the only reasonable and consistent theory of the entire transaction is that detailed by Father Schell. The defendant thought he was going to die very soon, in which event he desired his property to go to plaintiff, his nephew. To carry out this purpose was the object of the parties. In place of making a will he chose acting upon the advice of Schell—to deed the property to plaintiff—but to protect himself in case of a recovery, an event not then anticipated by any one, and in case of such recovery, he required a reconveyance from the plaintiff to be delivered to him. This is manifestly the most reasonable and consistent interpretation of his conduct, and is in harmony with the great weight of testimony. The claim that the deed to the plaintiff was made in payment of an antecedent debt for labor performed more than 25 years prior to its execution is not supported by any testimony, and is negatived by the plaintiff himself, who says that such labor was performed in payment of his "passage money" from Canada. The conveyance from the defendant to the plaintiff was in the nature of a gift *causa mortis,* and was probably revoked by his subsequent recovery: 3 Pomeroy, 1150; *Curtiss* v. *Barus,* 38 Hun, 165; *Basket* v. *Hassell,* 107 U. S. 602 (2 Sup. Ct. 415: 27 L. Ed. 500). But, whether it was or not, the deed

to him from the plaintiff was intended to revest the title in him in case of a recovery, and should be given that effect.

Decree affirmed.                                              AFFIRMED.

Mr. Commissioner SLATER, having been of counsel, took no part in the decision.